

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, WESLEY WEST MINERALS, LTD., and LONGFELLOW RANCH PARTNERS, L.P., | § § § § | No. 08-13-00145-CV |
| | | Appeal from the |
| Appellants, | § | 83rd Judicial District Court |
| v. | § | of Pecos County, Texas |
| SANDRIDGE ENERGY, INC. and SANDRIDGE EXPLORATION AND PRODUCTION, L.L.C., | § § | (TC# 6955) |
| Appellees. | § | |

## O P I N I O N

Appellants, the Commissioner of the General Land Office of the State of Texas, Wesley West Minerals, Ltd., and Longfellow Ranch Partners, L.P. (collectively referred to hereinafter as "Appellants"), appeal the outcome of several cross summary judgment motions filed by the parties in this oil and gas case. For the reasons that follow, we affirm in part, reverse in part, render in part, and remand in part this action to the trial court.

### BACKGROUND

This case concerns the construction of twelve oil and gas leases to which Appellees, SandRidge Energy, Inc. and SandRidge Exploration and Production, L.L.C. (hereinafter

collectively referred to as "SandRidge") are lessees. Seven of these leases are situated on Texas Relinquishment Act lands, entitling the Texas General Land Office (the "GLO") to royalty interests (collectively, the "State Leases"). Wesley West Minerals, Ltd. ("West") and Longfellow Ranch Partners, L.P. ("Longfellow") are the "owners of the soil" on six of the State Leases, and they equally share the royalties for these leases with the GLO. The remaining five leases do not concern the GLO, but only West and Longfellow, as lessors.[1] Although the terms of the twelve leases are not identical, similar questions regarding their allocation of post-production costs and provision of carbon dioxide royalties under the leases form the bases of the underlying suit. The parties' dispute over these issues arose when SandRidge changed the manner in which it processed sour gas produced from the leases.[2]

Prior to 2010, SandRidge transported sour gas from the various wells on the leases to one of three small plants ("the Legacy Plants"). Carbon dioxide was extracted from the natural gas stream at the Legacy Plants, leaving residue gas at the tailgate of the plants, plus small volumes of liquefied hydrocarbons. For a period of time, SandRidge sold the carbon dioxide so extracted and paid Appellants a royalty thereon. Beginning in September of 2010, however, sour gas produced from the leases was sent to a large new plant known as the Century Plant. This plant is owned by Oxy USA, Inc., but SandRidge built the plant. Whereas SandRidge used to sell the carbon dioxide after incurring the cost to extract it at the Legacy Plants, it now gives the carbon dioxide directly to Oxy, and in exchange, Oxy does not charge SandRidge for the cost of extracting carbon dioxide from the methane. Once the Century Plant was operational,

---

[1] The five non-State leases are known as the "South Piñon Fee Lease," the "2005 Longfellow Lease," the "Longfellow Green Lease," the "Longfellow Purple Lease," and the "West Citation Lease."

[2] The wells on the leases produce both "sour" and "sweet" gas. Sour gas is gas that, in its raw form, contains substances other than methane, such as hydrogen sulfide and/or carbon dioxide. Sour gas must be processed and refined before it is usable, whereas sweet gas is purer and does not require processing.

2

SandRidge informed the Appellants that it would no longer be paying royalties on carbon dioxide because it was no longer selling the carbon dioxide, which resulted in the underlying suit. The parties filed cross motions for partial summary judgment in the trial court, seeking various declarations regarding the allocation of post-production expenses and SandRidge's obligation to pay carbon dioxide royalties. The trial court determined all issues presented in SandRidge's favor. After determining that its summary judgment order concerned controlling questions of law opon which there is substantial ground for differences of opinion, the trial court entered an order permitting the parties to pursue the instant interlocutory appeal.[3]

## THE APPELLANTS' POINTS OF ERROR.

West and Longfellow present four issues in a jointly-filed brief. They challenge the trial court's rulings on the carbon dioxide royalty and post-production costs issues as to each of the twelve leases. In its brief, the GLO also presents two questions on the same issues regarding only the State Leases. Other than the State Leases, which are largely uniform in language, we find it simplest and most efficient to address Appellants' issues in terms of the leases individually.

## GOVERNING LEGAL STANDARDS

We review *de novo* the trial court's decision to grant a summary judgment. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009). On cross-motions for summary judgment, each moving party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). When a trial court grants one motion and denies others, we review all questions presented. *Id*. at 356–57. "The reviewing court should render such judgment as the trial court should have rendered." *Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). This

---

[3] *See* TEX.CIV.PRAC.&REM.CODE ANN. § 51.014(d)(West Supp. 2014).

3

includes, where appropriate, rendering judgment for the other movant. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988). However, we may also reverse the judgment and remand the cause when we find that course proper. *See Coker v. Coker*, 650 S.W.2d 391, 392 (Tex. 1983).

It is well settled that an "oil and gas lease is a contract, and its terms are interpreted as such." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex.2005). The construction of a contract is a question of law that we review *de novo*. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009). A court's primary goal in interpreting a contract is to give effect to the parties' intent as expressed in the writing. *Luckel v. White*, 819 S.W.2d 459, 461–63 (Tex. 1991). That intent is garnered from the language of the contract, which is considered in its entirety in an effort to understand, harmonize, and effectuate all its provisions, so that none will be rendered meaningless. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker*, 650 S.W.2d at 393. Further, the Court should not construe a contractual provision in a manner that is unreasonable or absurd. *See Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987).

Lastly, we are mindful that the parties to a lease agreement are considered the masters of their own choices. *See Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex.App.--Amarillo 2000, no pet.). It is the parties who select the terms and provisions to be included, and in so choosing, "each is entitled to rely upon the words selected to demarcate their respective obligations and rights." *Id.* "Simply put, we cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it." *Id.* (*citing HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 888–89 (Tex. 1998)).

4

# I. THE STATE LEASES

## A. SUMMARY OF THE PARTIES' DISPUTE REGARDING THE STATE LEASES

Although the specific terms of the seven State Leases are not identical, they are, as the parties agree, virtually the same in the pertinent sections, which are sections 4 and 7. Paragraph 4(B), which provides a royalty for non-processed gas, is the focal point of the parties' dispute regarding Section 4.

In relevant part, paragraph 4(B) provides as follows:

> NON PROCESSED GAS. Royalty on any gas (including flared gas), which is defined as all hydrocarbons and gaseous substances not defined as oil in subparagraph (A) above, produced from any well on said land (except as provided herein with respect to gas processed in a plant for the extraction of gasoline, liquid hydrocarbons or other products) shall be 25% part of the gross production or the market value thereof, at the option of the owner of the soil or the Commissioner of the General Land Office, such value to be based on the highest market price paid or offered for gas of comparable quality in the general area where produced and when run, or the gross price paid or offered to the producer, whichever is the greater . . . .

Appellants contend that this language provides two separate royalty payments—one for natural gas (i.e., methane), and another for carbon dioxide. Conversely, SandRidge maintains that 4(B) provides a single royalty on raw, unprocessed gas, as produced at the wellhead, contaminants (including but not limited to carbon dioxide) and all. In sum, SandRidge contends that paragraph 4(B) functions as a "market value at the well" clause, or one that pays royalty on the value of the raw gas at the wellhead, before it is transported, treated, or otherwise prepared for market. *See Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996); and *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 136 (Tex. 1996).

Appellants contest SandRidge's characterization of 4(B) as a market value at the well provision. Relying on the *Mewbourne Oil* case, Appellants argue that paragraph 4(B) is a "gross

proceeds" royalty provision, which is the opposite of a market value at the well provision. *Mewbourne Oil*, 939 S.W.2d at 136.

The parties also dispute the significance of a "no deductions" clause found in paragraph 7 of the State Leases. Paragraph 7 provides as follows:

> 7. NO DEDUCTIONS. Lessee agrees that all royalties accruing under this lease (including those paid in kind) shall be without deduction for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and otherwise making the oil, gas and other products hereunder ready for sale or use. Lessee agrees to compute and pay royalties on the gross value received, including any reimbursements for severance taxes and production related costs.[4]

Appellants assert that this provision makes the gross proceeds nature of the State Leases unmistakable, and that as result SandRidge is not permitted to deduct these sorts of costs from royalties payable under paragraph 4(B). SandRidge concedes that paragraph 7 makes it impermissible to deduct such expenses from royalties payable under *paragraphs 4(C) and 4(D)* of the State Leases, but it denies that paragraph 7 is applicable to paragraph 4(B).[5] Whereas paragraph 4(B) provides a royalty on unprocessed gas, paragraphs 4(C) and 4(D) provide royalties on different substances. Specifically, 4(C) provides a royalty on "processed gas," which it defines as "any gas processed in a gasoline plant or other plant for the recovery of

---

[4] The Appellants also consider Section 9 of the State Leases to be pertinent to their construction. Section 9 incorporates the rules regarding the payment of royalties set forth in the Texas Register. The Texas Register, in turn, provides that lessees paying royalties to the State of Texas on the basis of gross proceeds "shall not deduct production or severance taxes, or the cost of producing, processing, transporting, and otherwise making the oil, gas, and other products produced from the premises ready for sale or use." 31 TEX.ADMIN.CODE § 9.51(b)(1)(A)(2014)(General Land Office, Royalty and Reporting Obligations to the State). This provision is merely duplicative of Section 7 of the State Leases. Regarding lessees paying the State royalties on the basis of market value, the Register further provides that "market value shall be presumed to be the gross proceeds received pursuant to a bona fide contract entered into at arm's length between nonaffiliated parties of adverse economic interests." 31 TEX.ADMIN.CODE § 9.51(b)( 1)(E)(i). This provision is less protective of the State than the State Leases themselves, which define market value as being the *higher* of gross proceeds or the highest market price paid or offered for gas of comparable quality in the general area where produced and when run. As such, the Texas Register provisions cited by Appellants simply do not affect our analysis.

[5] SandRidge asserts that paragraph 4(B) is immune from paragraph 7's "no deduction" language because 4(B) is a market value at the well clause. It bases this argument on the *Heritage* case, which holds that a market value at the well provision renders a no deductions clause mere surplusage as a matter of law. *See Heritage*, 939 S.W.2d at 123.

gasoline or other liquid hydrocarbons . . . ."[6] Paragraph 4(D), in turn, provides a royalty on "other products," which it defines as follows: "carbon black, sulphur or any other products produced or manufactured from gas[7] (excepting liquid hydrocarbons) whether said gas be 'casinghead,' 'dry,' or any other gas, by fractionating, burning or any other processing[.]" SandRidge asserts that the question of whether costs are deductible under paragraphs 4(C) and 4(D) is immaterial, however, as is the question of whether carbon dioxide royalties are owed under 4(C) or 4(D). According to SandRidge, Appellants repudiated any reliance on paragraphs 4(C) and 4(D) in the trial court. Because this matter affects the scope of our review, we address it first.

**B.** *APPELLANTS LOOK SOLELY TO SUBPARAGRAPH 4(B) OF THE STATE LEASES FOR CARBON DIOXIDE ROYALTIES*

SandRidge asserts that the Appellants took the firm position in the trial court that subparagraph 4(B) is the State Lease clause that requires royalties be paid on carbon dioxide, and that neither 4(C) nor 4(D) is applicable. SandRidge presented the same argument to the trial court, and made it clear that it was framing its requested summary judgment relief accordingly: "SandRidge seeks summary judgment that *paragraph 4(B)* of the State Lease form does not obligate SandRidge to pay a *separate* royalty on C02." [Emphasis in the original]. The Appellants did not dispute SandRidge's description of their positions in the trial court, did not request declarations regarding subparagraphs 4(C) or 4(D), and did not otherwise argue that CARBON DIOXIDE royalties were payable under either 4(C) or 4(D). The GLO, in fact, responded to SandRidge's summary judgment motion by asserting that 4(C) and 4(D) "simply

---

[6] In one of the State Leases, the "South Piñon State Lease," the language underlined above, "other liquid hydrocarbons," is followed by the phrase "or other liquid or gaseous substances." Appellants do not present any particularized arguments regarding the South Piñon State Lease.

[7] In the South Piñon State Lease, the language underlined above, "or any other products produced or manufactured from gas," reads "or any other products produced, *recovered* or manufactured from gas." [Emphasis added].

do[] not apply to the facts or the dispute in this litigation." Before this Court, the Appellants continue to disavow any reliance on subparagraph 4(D). They likewise continue to insist that subparagraph 4(B) is the carbon dioxide royalty provision, but dispute that they have waived reliance on 4(C). We disagree.

Pursuant to Rule 166a(c) of the Texas Rules of Civil Procedure, a motion for summary judgment must specifically state the grounds on which it is based. TEX.R.CIV.P. 166a(c). Likewise, a non-movant's response to a summary judgment motion must specifically identify the grounds it contends defeat the motion. *McConnell v. Southside Independent School Dist.*, 858 S.W.2d 337, 341 (Tex. 1993)(*citing City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex. 1979)). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX.R.CIV.P. 166a(c). The Fourteenth District Court of Appeals considered the effect of Rule 166a(c) under analogous circumstances in an employment case, *Mayfield v. Lockheed Engineering & Sciences Co.*, 970 S.W.2d 185 (Tex.App.--Houston [14th Dist.] 1998, pet. denied).

In *Mayfield*, an employee/plaintiff asserted on appeal that he had been wrongfully terminated for refusing to perform an illegal act. *Id*. at 187 n.2. In his response to the employer's summary judgment motion, however, the employee asserted only that he had a *good faith belief* that the actions he was asked to perform were illegal. *Id*. Citing Rule 166a(c), the Houston court refused to consider this positional shift. *Id*. *See also Aguilar v. Trujillo*, 162 S.W.3d 839, 854-55 (Tex.App.--El Paso 2005, pet. denied)(refusing to consider appellate arguments regarding statutory violations that were not raised in response to a summary judgment motion). Here, similarly, the Appellants' summary judgment arguments were restricted to

8

paragraph 4(B). They did not argue that carbon dioxide royalties were payable under paragraphs 4(C) or 4(D). In fact, this continued to be the state of the summary judgment record even after SandRidge specifically called attention to the Appellants' non-reliance on 4(C) and 4(D). Thus, while we are bound to consider paragraphs 4(C) and 4(D) in order to understand, harmonize, and effectuate all of the State Leases' provisions, only a royalty on carbon dioxide that is payable under 4(B) can form the basis of a reversal of the trial court. *Thompson*, 94 S.W.3d at 554; TEX.R.CIV. P.166a(c).

## C. DOES PARAGRAPH 4(B) PROVIDE A ROYALTY ON CARBON DIOXIDE?

We must now determine whether paragraph 4(B) provides a royalty on carbon dioxide in addition to a royalty on methane. SandRidge, in favor of a royalty only on methane, asserts that several components of the State Leases make it clear that paragraph 4(B) functions as a market value at the well clause. "Market value 'at the well' means the value of gas at the well, before it is transported, treated, compressed or otherwise prepared for market." *Heritage Resources*, 939 S.W.2d at 129 (Owen, J., concurring). Conversely, Appellants contend that 4(B) is a "gross proceeds" royalty provision, which is the opposite of a market value at the well provision. These arguments turn on the *Heritage Resources* and *Mewbourne Oil* cases, which the Texas Supreme Court decided on the same day. *Id*; *Mewbourne Oil*, 939 S.W.2d at 135.

The *Heritage* case concerned the allocation of post-production transportation costs under a market value at the well lease with a "no deduct" clause specifying that post-production costs could not be deducted from royalties paid under the lease. *Heritage Resources*, 939 S.W.2d at 120-21. The court began by noting that while royalties are generally not subject to the costs of production, they are generally subject to post-production costs, including taxes, treatment costs, and transportation costs. *Id*. at 122. Nonetheless, a lease specifying that royalty is to be paid on

9

market value at the well effectively nullifies a clause attempting to exempt the royalty from post-production expenses. *Heritage Resources*, 939 S.W.2d at 123. As the concurring opinion in *Heritage* explained: "The concept of 'deductions' of marketing costs from the value of the gas is meaningless when gas is valued at the well. *Value at the well is already net of reasonable marketing costs*." [Emphasis added]. *Id*. at 130 (Owen, J., concurring). From SandRidge's perspective, *Heritage* stands for the principle that a market value at the well clause trumps any other provision that conflicts with it.

The *Mewbourne Oil* case, on which Appellants rely, also concerned the deduction of post-production expenses from royalties derived from royalty clauses containing market value at the well language. *Mewbourne Oil*, 939 S.W.2d at 135. Unlike *Heritage*, however, one of the clauses at issue in *Mewbourne* contained both "gross proceeds" and "at the well" language: "Settlement for gas sold shall be based on the gross proceeds realized at the well by you." *Id*. at 136. Whereas "at the well" means the value of gas before it has been refined and improved, "gross proceeds" means that the royalty is to be based on the gross price received by the lessee. *Id*. The court held that these conflicting provisions rendered the agreement ambiguous. *Id*.

Determining whether a contract is ambiguous is a question of law. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We may conclude that a contract is ambiguous even when, as is the case here, the parties do not assert ambiguity. *Coker*, 650 S.W.2d at 392-94 (although both parties asserted agreement was unambiguous and moved for summary judgment, supreme court concluded ambiguity existed, making summary judgment improper). At the same time, ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable. *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). A contract is

10

not ambiguous when, based on the plain language, the court can give it a certain or definite legal meaning or interpretation. *Univ. Health Servs., Inc. v. Renaissance Women's Group., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). As such, the question becomes whether Appellants' and SandRidge's conflicting interpretations are reasonable, without rendering any portion of the State Leases meaningless. *See Coker*, 650 S.W.2d at 394 (holding that no reasonable interpretation should render a provision meaningless).

Although paragraph 4(B) does not expressly state that it is a market value at the well clause, several other terms make it clear nonetheless that its royalty is payable only on a single substance: raw gas, as it comes out of the ground from the well, together with carbon dioxide and all of the other various components. These terms make 4(B) the functional equivalent of a market value at the well clause, and Appellants' contrary interpretation would render the terms meaningless. For instance, reading paragraph 4(B) as providing two royalties on two substances would render the wellhead measurement requirement meaningless.

A wellhead measurement determines the volume of the gas produced at the wellhead for the purpose of calculating the amount of the royalty due. *See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 704 (Tex. 2008). Paragraph 4(B) requires that the royalty be calculated on such a measurement.[8] The royalty is therefore owed on the substance so measured: raw gas, including all of its components. *Sowell v. Natural Gas Pipeline Co. of Am.*, 789 F.2d 1151, 1157–58 (5th Cir. 1986)(analyzing Texas law). *See also Bowden*, 247 S.W.3d at 706. "[W]hen there is a wellhead measurement, payment is due for gas in its natural state, not on the liquid hydrocarbons which are later extracted." *ConocoPhillips Co. v. Incline Energy, Inc.*, 189 S.W.3d 377, 381

---

[8]  4(B)'s wellhead measurement provision requires that "the maximum pressure base in measuring the gas under this lease shall not at any time exceed 14.65 pounds per square inch absolute, and the standard base temperature shall be sixty (60) degrees Fahrenheit, correction to be made for pressure according to Boyle's Law, and for specific gravity according to tests made by the Balance Method or by the most approved method of testing being used by the industry at the time of testing."

11

(Tex.App.--Eastland 2006, pet. denied)(*citing Carter v. Exxon Corp.*, 842 S.W.2d 393 (Tex.App.--Eastland 1992, writ denied)). The reason for this rule is simple: "the volume of gas exiting the tailgate [of a processing plant] is smaller than the volume at the wellhead because natural gas liquids and impurities such as water vapor are condensed from the gas stream[.]" *Dynegy Midstream Services, Ltd. Partnership v. Apache Corp.*, 294 S.W.3d 164, 167 (Tex. 2009). Consequently, Appellants argument for that construction of 4(B) renders paragraph 4(B)'s wellhead measurement requirement meaningless. If 4(B) required separate royalty payments on methane and later-extracted carbon dioxide, there would be no purpose whatsoever in measuring the volume of the raw gas stream at the wellhead.

Appellants' construction would also destroy the purpose of language specifying that 4(B)'s royalty stems from "gross production." This language is found in the portion of 4(B) providing the lessors' two payment options: they may take their royalty as an in-kind share, or they may take the market value of their in-kind share: "[The royalty on non-processed gas] shall be 25% part of the *gross production* or the market value *thereof*, at the option [of Appellants] . . . ." [Emphasis added]. Either way, 4(B)'s royalty is based on *gross production*. "Production means actual physical extraction of the mineral from the land." *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 244 (Tex. 1981). It does not include subsequent efforts to improve or refine the gas so produced:

> 'Production' means 'the act of producing oil, gas, and other minerals,' not the act of transporting, gathering, treating, processing, or marketing oil or gas. Historically, 'production' ceases once the lessee extracts oil or gas from the ground at the wellhead. The historical definition of 'production' is consistent with the common understanding of the term; to 'produce' is to make or create a product that did not previously exist, and not to refine or improve a product already in existence.

*Blackmon v. XTO Energy*, 276 S.W.3d 600, 604 (Tex.App.--Waco 2008, no pet.)(*quoting* Byron

12

C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the "Product"?*, 37 ST. MARY'S L.J. 1, 88–89 (2005)). *See also Piney Woods Country Life School v. Shell Oil Co.*, 539 F.Supp. 957, 971 (S.D.Miss. 1982), *aff'd in part, rev'd in part on other grounds*, 726 F.2d 225, 240 (5th Cir. 1984). Thus, paragraph 4(B) provides as royalty a 25 percent in-kind share of the unrefined, unimproved gas produced at the wellhead, or the market value thereof. If Appellants elected to take their royalties under paragraph 4(B) in-kind, raw gas is clearly what they would take. As the limiting phrase "or the market value *thereof*" makes equally plain, if they instead chose the cash option, they would take the market value of their 25 percent share of the raw gas. Appellants' proposed interpretation renders this language meaningless.

Relying on the *Mewbourne Oil* case, Appellants counter that paragraph 4(B) is a gross proceeds royalty provision, and that construing it otherwise renders meaningless certain language regarding the manner in which the market value of gross production can be determined. Specifically, this language, contained in paragraph 4(B), provides:

> [The market value of lessor's 25 percent share of gross production shall] be based on [1] the highest market price paid or offered for gas of comparable quality in the general area where produced and when run, or [2] *the gross price paid or offered to the producer, whichever is the greater*[.] [Emphasis added].

Appellants assert that the second valuation method, the "gross price paid or offered" method, is a gross proceeds provision precisely like that which was at issue in *Mewbourne*. *See Mewbourne Oil*, 939 S.W.2d at 136.

While no party asserts that paragraph 4(B) is ambiguous, the presence of both gross proceeds and at the well language rendered the agreement in *Mewbourne Oil* ambiguous. *Id*. But *Mewbourne* is necessarily limited to its facts. The presence of seemingly conflicting terms does not render a contract ambiguous unless, looking at the entirety of the contract, both

13

interpretations are reasonable. *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520. If the entirety of the State Leases is worded so that 4(B) can be given a certain or definite legal meaning, it is not ambiguous, and we must construe it as a matter of law. *American Manufacturers Mutual Insurance Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

Although paragraph 4(B) provides that market value may be determined by the gross price paid or offered, the substance to be valued by its gross price continues to be "gross production." In other words, this language refers to the gross price that might be paid or offered to SandRidge by a buyer for the raw gas—i.e., the price offered or received for gas at the well without any deduction from the royalty for the costs of production. This reading comports with the well-understood characteristics of royalty: "Royalty is commonly defined as the landowner's share of production, free of expenses of production." *Heritage*, 939 S.W.2d at 121–22 (*citing Delta Drilling Co. v. Simmons*, 161 Tex. 122, 338 S.W.2d 143, 147 (1960)). Appellants argue that such a reading is flawed because there is no market for sour gas at the well in the area of the State Leases, but its argument is based impermissibly on parol evidence.[9]

Additionally, another function of 4(B)'s "gross price paid or offered" language becomes apparent when it is considered jointly with 4(B)'s alternative provision in determining the market value of gross production that is: "price paid or offered for gas of comparable quality in the general area where produced and when run . . . ." This method is known as the "comparable sales" method. *Heritage*, 939 S.W.2d at 122. The most reasonable interpretation of 4(B)'s use of this two-pronged valuation approach is that it serves to protect the lessor in the event a long-

---

[9] Further, there is at least some market for raw gas at the well within the industry (*see, e.g., Tana Oil and Gas Corp. v. Cernosek*,188 S.W.3d 354, 361 (Tex.App.--Austin 2006, pet. denied), the existence of which is controlled by numerous variables, such as price, consumer demand, the creation of pipelines and refining facilities, and emerging technologies. Whether there is a market for raw gas at the State Leases' wells is immaterial. The parties are the masters of their own agreement. *See Cross Timbers Oil*, 22 S.W.3d at 26.

term gas purchase agreement between the lessee and a buyer results in the gas being sold at a premium over a lower, then-current market value. In such a situation, and without language mandating that the lessor gets the higher of the two, a market value lessor is entitled only to the lower prevailing market price. *Yzaguirre v. KCS Resources, Inc.*, 53 S.W.3d 368 (Tex. 2001). *See also Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 870 (Tex. 1968).

Appellants next contend that construing paragraph 4(B) as a market value at the well clause renders paragraph 7 of State Leases meaningless. Paragraph 7 is a "no deduct" clause, prohibiting the deduction of post-production expenses from all royalties accruing under the State Leases. This is precisely the sort of clause that a market value at the well provision renders "surplusage as a matter of law." *Heritage Resources*, 939 S.W.2d at 123. Yet another reason Appellants' argument fails is that paragraph 7 provides protection from post-production costs to royalties payable under paragraphs 4(C) and 4(D) of the State Leases even though it does not do so for paragraph 4(B).

Appellants additionally assert that construing paragraph 4(B) to pay only a royalty on methane renders its "any gas" language meaningless: "Royalty on *any gas* (including flared gas), which is defined as all hydrocarbons and gaseous substances not defined as oil . . . ." [Emphasis added]. Because carbon dioxide is clearly a "gaseous substance," argue Appellants, 4(B) requires a royalty on carbon dioxide be paid. But this argument runs afoul of the principle that no one phrase, sentence or section of a contract should be isolated and considered apart from the contract's other provisions. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). Appellants' interpretation incorrectly ignores paragraphs 4(C) and 4(D) of the State Leases.

Reading all parts of the State Leases together, it is clear that paragraphs 4(B), 4(C), and 4(D) have a progressive application to the various stages of the production and refinement of natural gas.[10] Paragraph 4(B) applies to "non-processed gas," 4(C) applies to "processed gas," and 4(D) applies to "other products" later produced or manufactured from gas. SandRidge argues that non-processed gas means raw natural gas—that is, the sour gas stream produced at the wellhead, prior to any refinement, including both methane and various other commingled substances, such as nitrogen, ethane, oxygen, and carbon dioxide. As such, says SandRidge, the royalty called for by 4(B) is singular, on all these things combined. We agree. A royalty on carbon dioxide may be separately payable under paragraphs 4(C) or 4(D), but it is not separately payable under paragraph 4(B).

First, there is quite simply no language in 4(B) requiring the lessee to calculate and pay several independent royalties on the various component elements of the raw natural gas stream. To the contrary, this is precisely the function of the portions of the State Leases that Appellants have repudiated: paragraphs 4(C) and 4(D).

Second, it is *production* that triggers the royalty due under 4(B), whereas the royalties payable under paragraphs 4(C) and 4(D) are triggered by postproduction efforts to render or extract other substances from the raw gas. Again, "production" means the actual physical extraction of the mineral from the ground. It does not include post-production efforts to refine or improve the gas, or to process it into other products. *Middleton*, 613 S.W.2d at 244; *Blackmon*, 276 S.W.3d at 604. Carbon dioxide is extracted from the natural gas stream in order to refine or improve the gas stream, and paragraph 4(B)'s "any gas" language cannot reasonably be read to provide a second royalty on it.

---

[10] Indeed, 4(B) expressly adopts this progression by excluding from its definition of "any gas" substances that are "processed in a plant for the extraction of gasoline, liquid hydrocarbons or other products."

16

Relying on the affidavit of its oil and gas industry expert, Ricardo Garza, the GLO argues that carbon dioxide nonetheless qualifies as a non-processed gas under paragraph 4(B) because "processing," as that term is commonly used in the oil and gas industry, does not include extracting carbon dioxide from methane. We reject this argument. A term that is not specifically defined in a contract must be given its ordinary and generally accepted meaning, unless the contract itself shows the term to have been used in a different sense. *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966). "[L]anguage used by the parties should be given its plain grammatical meaning unless it *definitely appears* that the intention of the parties would thereby be defeated." [Emphasis added]. *Id.* There is no indication in the State Leases that the parties intended to use the term "processed" in the limited manner advanced by Garza. As such, Garza's affidavit constitutes impermissible parol evidence. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996). "Experts have a proper (if confined) role in litigation, but it is not to supply parol evidence to vary or contradict the terms of unambiguous contracts." *Dynegy Midstream Services, Ltd. Partnership v. Apache Corp.*, 294 S.W.3d 164, 170 (Tex. 2009).[11] Carbon dioxide cannot be construed to be a non-processed gas under the State Leases.

### D. CONCLUSIONS AS TO THE STATE LEASES

Because paragraph 4(B) of the State Leases does not provide a royalty on carbon dioxide, we overrule the GLO's first issue, and West's and Longfellow's first issue as it pertains to the State Leases. Along similar lines, because paragraph 4(B) is intended to be the functional

---

[11] Even if we were to consider Garza's affidavit (which actually concerns the Citation Lease, not the State Leases), it would not change the result. Garza concludes that extracting carbon dioxide from raw gas is customarily regarded as "treating," not processing, the gas. He relies on an oil and gas industry glossary that defines "treating" as "the *process* of removing objectionable substances from gases and liquids." [Emphasis added]. For our purposes, this definition is too circuitous to be useful. Moreover, while Garza's affidavit arguably addresses whether carbon dioxide qualifies as a processed or non-processed gas, it does not address the third alternative: whether carbon dioxide constitutes an "other product" controlled by paragraph 4(D).

17

equivalent of a market value at the well clause, there are no post-production costs to deduct. Value at the well is already net of post-production costs. *Heritage Resources*, 939 S.W.2d at 130 (Owen, J., concurring). Accordingly, we also overrule the GLO's second issue, and West's and Longfellow's second issue as to the State Leases. This disposes of all of the GLO's points, leaving only West's and Longfellow's issues concerning the other (non-state) leases.

## II. THE CITATION LEASE

### A. SUMMARY OF THE PARTIES' DISPUTE REGARDING THE CITATION LEASE

We next consider the Citation Lease, which is a lease between only West and SandRidge. The Citation Lease's royalty provisions are similar in many respects to those of the State Leases, giving rise to similar arguments. West presents three issues for our determination. First, is a separate royalty on carbon dioxide due under the Citation Lease? Second, is the lease a gross proceeds lease, exempt from post-production costs? Third, which of the Citation Lease's several royalty provisions applies (if any) to carbon dioxide? The third question, concedes West, controls the first two. West contends that the only paragraph of the citation lease under which a royalty on carbon dioxide is payable is paragraph 3(A)(2). Conversely, SandRidge maintains that paragraphs 3(A)(4), 3(A)(5), and 3(A)(7) control the payment of carbon dioxide royalties.

Citation Lease paragraph 3(A)(2), which West claims is controlling, provides as follows:

[The royalties to be paid by lessor to lessee are:] On gas, including casinghead gas, and *all gaseous substances* from the leased premises and sold or used off the leased premises except in the manufacture of gasoline or other products therefrom in accordance with the provisions of subdivision [4][12] of this paragraph 3, *the market value at the well of twenty-four percent (24%) of eighty-eighths (8/8) of the gas sold or used, or the gross price paid or offered to the producer, whichever is greater*, provided that the *maximum pressure base* in measuring the gas produced by virtue of this lease shall not at any time exceed 14.65 pounds per

---

[12]   As the parties agree, there is a scrivener's error in paragraph 3(A)(2), wherein there is a mistaken reference to "subdivision *(d)* of this paragraph 3." [Emphasis added]. The parties stipulate that this should be a reference to "(4)," not "(d)," meaning it is intended as a reference to Citation paragraph 3(A)(4).

square inch absolute, and the standard base temperature shall be sixty (60) degrees Fahrenheit, correction to be made for pressure according to test made by the Balance Method or by the most approved method of testing. *Lessor shall never be required to bear any portion of the expense of transportation, dehydration, compression or other similar charges*.[13] [Emphasis added].

Like its State Leases counterpart, paragraph 3(A)(2) contains "all gaseous substances" language, a two-prong royalty valuation test that seemingly implicates both "at the well" and "gross proceeds" interpretations, a gas pressure measurement requirement, and a "no deduct" provision.

Also like the State Leases, the Citation Lease has a series of progressive royalty provision clauses that track the downstream refinement and manipulation of raw gas. The first is paragraph 3(A)(3), which specifies that the lessee must run all gas through mechanical separators before it is sold or used. When gas is produced, it commonly goes through a mechanical separator through which condensate drops out as a liquid at the wellhead. *Samson Lone Star, Ltd. Partnership v. Hooks*, 389 S.W.3d 409, 436 (Tex.App.--Houston [1st Dist.] 2012, pet. granted). Condensate consists of "hydrocarbons that exist in the form of gas when contained in the natural gas reservoir underground, which condense into a liquid form when released from the reservoir's higher pressure and temperature." *Bowden*, 247 S.W.3d at 704 n.7. Because the separators are located in the field, and the process is usually performed prior to metering and sale of the gas, condensate is therefore considered separately from liquids later processed in a plant. *Id*. Paragraph 3(A)(3) relates to this step of the overall process and provides a royalty on condensate.

The remainder of the Citation Lease's royalty provision clauses continue to track the downstream movement of natural gas production. These are the only provisions, says

---

[13] The Citation Lease's royalty provisions are contained in section three of the lease, which has several subparts. Two of these subparts, paragraphs 3(A) and 3(B), which concern two different parcels of land, are the subject of parties' dispute. The language of 3(A) and 3(B) is identical except for royalty percentages, however, and those percentages are not in dispute. As such, our opinion will refer only to paragraph 3(A), as the analysis is the same.

SandRidge, that are in any way relevant to carbon dioxide royalties. Paragraph 3(A)(4) provides a royalty on gas "processed in an absorption or extraction plant" owned or operated by the lessor, and paragraph 3(A)(5) provides a royalty on gas produced in such a plant that is owned or operated by a third party. The proper meaning of this phrase, "absorption or extraction plant," is in dispute. Finally, paragraph 3(A)(7) is a catch-all that provides a royalty on residue gas, which the clause parenthetically defines as "gas remaining after processing for liquid hydrocarbons." The parties dispute whether methane remaining after the extraction of carbon dioxide qualifies as residue gas under this definition.[14]

## B. DOES PARAGRAPH 3(A)(2) PROVIDE A SEPARATE ROYALTY ON CARBON DIOXIDE?

We first consider West's contention that Citation Lease paragraph 3(A)(2) exclusively provides and controls carbon dioxide royalties. The presence of market value at the well and gross proceeds language in paragraph 3(A)(2) once again requires us to construe ambiguity and the reasonableness of the parties' respective interpretations. A contract is not ambiguous "merely because the parties disagree on its meaning." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). Likewise, lack of clarity or even inartful drafting will not alone render an agreement ambiguous. *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006).

The most conspicuous problem with West's position is that paragraph 3(A)(2) simply has no framework for providing multiple royalties. There is no language, for instance, mentioning or requiring the extraction of any substance, providing that a royalty will be paid upon extraction,

---

[14] Another downstream royalty provision, paragraph 3(A)(6), establishes a royalty on gas sold by the lessee to a third party as part of a "percentage of proceeds" contract. This sort of contract is based on percentages of the amounts that the third party receives for the components of the gas stream after processing. *See, e.g., Tana Oil and Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360-61 (Tex.App.--Austin 2006, pet. denied). West asserts in the alternative that it is entitled to a carbon dioxide royalty under this provision if not so entitled under paragraph 3(A)(2). But as West concedes elsewhere in its brief, SandRidge does not sell the raw gas to Oxy under such an arrangement. Consequently, there is no percentage of proceeds contract, and paragraph 3(A)(6) is immaterial to our analysis.

or stating that a royalty will be paid on methane remaining after extraction. The absence of any such language stands in stark contrast to the successive royalty clauses, paragraphs 3(A)(4) through 3(A)(7), which focus exclusively on royalties that are payable following post-production efforts. Rather than providing multiple royalties, 3(A)(2)'s royalty is unquestionably singular, to be paid "on gas," which includes "all gaseous substances."

Further, as with the State Leases, West's reading of 3(A)(2)'s "all gaseous substances" language as creating two distinct royalties does not comport with the progressive nature of the lease's royalty clauses. The Citation Lease's royalty clauses sequentially track the stages and contingencies of the production and improvement of natural gas. This is reflected in the royalty valuation point, which shifts location as each new gas-related product emerges. Paragraph 3(A)(2) values gas *at the well*, 3(A)(3) measures the value of condensates *at the separator*, and so on. Ignoring this pattern to read 3(A)(2) as creating multiple royalties on multiple products that have no directly sequential relationship to one another is not a reasonable interpretation.

Yet another factor weighing against construing 3(A)(2) as providing multiple royalties is that the paragraph clearly valuates a single substance. This is made clear by 3(A)(2)'s language requiring that the pressure of the substance be measured. There would be no point in measuring the pressure if the substance were only to be split into multiple components and separately valued. *Bowden*, 247 S.W.3d at 704; *Incline Energy, Inc.*, 189 S.W.3d at 381. Accordingly, the substance being measured and valued in 3(A)(2) is raw gas, as it is produced at the wellhead. West's contrary interpretation renders the leases' pressure measurement requirement meaningless.

Likewise, although 3(A)(2) provides two ways of determining the substance's value— market value at the well or gross price paid or offered—the substance itself does not change.

21

Contrary to West's argument, such a reading does not render 3(A)(2)'s no-deductions clause meaningless. Per *Heritage*, because the paragraph values gas at the well, prior to any post-production expense, the no-deduct clause is immaterial. *Heritage Resources*, 939 S.W.2d at 123, 129-30. "Value at the well is already net of reasonable marketing costs." *Id.* at 130. The presence of both at the well and gross proceeds language does not render the Citation Lease ambiguous under these circumstances. *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520.

## C. DO PARAGRAPHS 3(A)(4), (5), AND (7) APPLY TO CARBON DIOXIDE?

Having determined that 3(A)(2) does not provide a separate royalty on carbon dioxide, we next consider whether such Citation Lease paragraphs 3(A)(4), 3(A)(5), and 3(A)(7) apply to carbon dioxide.

West argues that the Century and Legacy plants, which extract carbon dioxide from the raw gas produced from the Citation Lease, do not qualify as "absorption or extraction plants" within the meaning of paragraphs 3(A)(4) and 3(A)(5), and thus that the paragraphs do not apply to carbon dioxide. They base their argument on the opinions of their industry expert, Ricardo Garza. According to Garza, the oil and gas industry considers absorption and extraction plants to be those that extract natural gas liquids ("NGLs," or liquid hydrocarbons, such as ethane, propane, and butane) from a gas stream. In particular, West relies on Garza's opinion that the Century and Legacy plants are "treating plants," not absorption or extraction plants. SandRidge objected to this characterization of the Century and Legacy plants, however, and the trial court sustained its objection. West does not challenge this evidentiary ruling. Thus, there is no evidence in the summary judgment record establishing that the Century and Legacy plants are not absorption or extraction plants. To the contrary, it is undisputed that the Century and Legacy plants indeed do extract small quantities of NGLs. Although Garza concedes this, he draws a

22

distinction by concluding that the primary purpose of the Century and Legacy plants is the removal of carbon dioxide, not the extraction of NGLs. Regardless, there is no such "primary purpose" restriction within the terms of paragraph 3(A)(4) or 3(A)(5). Once again, expert testimony may not be relied upon to vary or contradict the terms of an unambiguous contract. *Dynegy Midstream Services, Ltd. Partnership*, 294 S.W.3d at 170. Accordingly, the "absorption or extraction plant" language in paragraphs 3(A)(4) and 3(A)(5) does not render the paragraphs inapplicable to carbon dioxide.

West's next argument pertains to Citation Lease paragraph 3(A)(7), which works in conjunction with paragraphs 3(A)(4) and 3(A)(5) by providing a royalty on residue gas—the methane remaining after the downstream refinement of the raw gas stream. It argues that paragraph 3(A)(7)'s definition of residue gas as "gas remaining after processing for liquid hydrocarbons" renders paragraphs 3(A)(4) and 3(A)(5) inapplicable to carbon dioxide, which is not a liquid hydrocarbon. Again, however, it is uncontested that the Century and Legacy plants also separate liquid hydrocarbons from the raw gas stream, leaving residue methane. Neither paragraph 3(A)(7) nor any other portion of the Citation Lease limits the definition of residue gas to that which is left over after processing the raw gas stream *primarily* for liquid hydrocarbons.

### D. CONCLUSIONS AS TO THE CITATION LEASE

Based on the foregoing, we conclude that Citation Lease paragraph 3(A)(2) does not provide a separate royalty on carbon dioxide, and that paragraphs 3(A)(4) and 3(A)(5) are applicable to carbon dioxide. Paragraph 3(A)(4) provides a royalty on carbon dioxide extracted from the raw gas stream in a plant owned or operated in whole or in part by SandRidge, the applicable royalty percentages of which are based on the market value of such carbon dioxide as determined immediately upon extraction. SandRidge is entitled to deduct from the 3(A)(4)

23

carbon dioxide royalty the "pro rata cost of transporting, processing, manufacturing, compressing, and selling such [carbon dioxide] and the by-products there-from, but all such costs shall be directly attributable to such functions, and shall not include overhead." Paragraph 3(A)(5) applies to carbon dioxide extracted from the raw gas stream in a plant owned or operated by third parties ("parties other than [SandRidge] or any assignee of [SandRidge] or affiliate, parent or subsidiary company or either of them"). However, the royalty provided in 3(A)(5) reverts to "market value at the well," which means raw gas as produced at the wellhead, including all of its constituents. As such, paragraph 3(A)(5) does not provide a royalty on carbon dioxide. *Heritage Resources*, 939 S.W.2d at 129. We overrule West's fourth issue, as well as its first and second issues as they pertain to the Citation Lease.[15]

### III. The Longfellow Green and Purple Leases

### A. Summary of the Dispute Regarding the Green and Purple Leases

We next consider the Longfellow Green and Purple leases, which are between SandRidge and Longfellow only. The relevant portions of the gas royalty clauses of these leases, which are identical, provide as follows:

> The royalties reserved by Lessor, and which shall be paid by Lessee, are: . . . (b) on gas (which term includes casinghead gas and all other gaseous or vaporous substances) used by Lessee off the premises for any purpose, including the manufacture of gasoline or the extraction of sulphur or any other products, the *market value at the well* of one-eighth (l/8th) of the gas so used, and on gas sold

---

[15] West argues that SandRidge's arrangement with Oxy, whereby SandRidge transfers ownership of carbon dioxide extracted at the Century plant to Oxy in exchange for Oxy treating the gas free of charge, constitutes a "sale" of the carbon dioxide. We agree. "The term 'sale,' when used in a property context, is commonly understood to mean any conveyance of an estate for money or money's worth." *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982). *See also Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 316 (Tex.App.--Houston [14th Dist.] 2003, pet. denied)(*citing McKinney v. City of Abilene*, 250 S.W.2d 924, 925 (Tex.Civ.App.--Eastland 1952, writ ref'd n.r.e.)). Nonetheless, this matter does not factor into our conclusion as to the Citation Lease. SandRidge, by virtue of the nature of the declaration it sought from the trial court regarding paragraph 3(A)(4) of the Citation Lease, has conceded that a royalty on carbon dioxide is payable under said paragraph, regardless of any arrangement it had with Oxy. The nature of SandRidge's arrangement with Oxy likewise has no bearing on our conclusion regarding paragraph 3(A)(5) of the Citation Lease, as no royalty on carbon dioxide is due under 3(A)(5) in the first instance.

24

by Lessee, one-eighth (l/8th) of the *net proceeds* derived from the sale thereof computed at the contract price fixed in any gas sales contract, either short or long term, entered into in good faith by Lessee . . . provided that the term 'net proceeds' herein used shall mean the proceeds remaining after deducting all severance and production taxes together with all costs and expenses *actually incurred* by the Lessee gathering, transporting, treating, processing, and compressing the *gas so sold* under the terms of said gas sales contract . . . . [Emphasis added].

The parties disagree as to whether this language provides a separate royalty on carbon dioxide. The parties also disagree about the proper allocation of certain transportation costs, known as "firm transportation charges." As Longfellow acknowledges, the Green and Purple Leases are net proceeds leases. As such, transportation costs actually incurred by SandRidge in its sales of gas are properly deductible from the royalties it pays on such gas. Nonetheless, Longfellow argues, the trial court's ruling improperly permits SandRidge to deduct firm transportation charges from the royalties it pays regardless of whether the charges stem directly from the sale of gas that generated such royalties.

## B.  The Green and Purple Leases Do Not Provide a Separate Royalty on Carbon Dioxide

The language of the Green and Purple Leases plainly establishes that no separate royalty on carbon dioxide is due. The portion of the gas royalty clause pertaining to carbon dioxide is that which governs gas used off the premises for any purpose, including "the extraction of sulphur *or any other products*." [Emphasis added]. Carbon dioxide clearly constitutes an "other product" extracted from gas off the premises. The royalty on such sour gas is singular, and it is payable on a market value at the well basis. As we have seen, market value at the well means the value of gas before it is "transported, treated, compressed or otherwise prepared for market." *Heritage Resources*, 939 S.W.2d at 129. We overrule Longfellow's first issue as it pertains to the Green and Purple Leases.

## C.  Firm Transportation Charges under the Green and Purple Leases

25

A firm transportation charge is an upfront reservation fee a gas producer pays to a pipeline owner in order to secure future space in the pipeline for the delivery of its gas to distant markets. *Independent Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1038, 1042 (D.C. Cir. 2002). When the producer later actually ships the gas, it typically incurs a "commodity charge" for the transport itself. *Id.* at 1042. The reservation fee, however, is nonrefundable. *Id.* The cost will be lost unless the producer is able to resell the capacity it reserved through payment of the firm transportation charge. *Id.* Alternatively, a producer can forgo paying firm transportation charges, but its access to pipeline capacity is then subject to the changing needs of other, higher priority customers. *DeWitt*, 279 F.3d at 1042.

There is virtually no judicial authority discussing, much less meaningfully analyzing firm transportation charges. The only case cited by the parties is the *Dewitt* case. *See DeWitt*, 279 F.3d at 1042. The *Dewitt* case is dissimilar to our case at hand, because it did not involve a contractual dispute. *Id.* at 1036-42.

In *DeWitt*, a trade association representing gas producers challenged certain Department of the Interior regulations governing cost deductions from royalties paid to the government on federal leases. *Id*. at 1037-38. One of the challenged regulations prohibited producers from deducting unused firm transportation costs from federal royalties. *Id*. at 1042. In siding with the trade association and holding the regulation to be arbitrary and capricious, the court noted that the only counterargument presented by the Department of the Interior was a single *ipse dixit* statement that it did "'not consider the amount paid for unused capacity as a transportation cost,' [without] revealing to what category such expenses did belong." [Internal citations omitted]. *Id.* The dispute was not contractual in nature, and the Department of the Interior did not assert that such charges were unrelated to gas produced and sold from federal leases. *Id.* at 1036-42. Other

26

than *Dewhitt's* explanation of what firm transportation charges are, the case is not helpful to our analysis.

Whether firm transportation charges are properly deductible from royalties paid under the Green and Purple Leases is determined squarely by the leases' unambiguous contractual terms. The issue is not whether firm transportation charges qualify generally as transportation costs. They clearly do. The question instead is whether firm transportation charges must be, per the terms of *these particular leases*, actually incurred from sales of gas produced from the Green and Purple Leases before they are properly deductible from royalties paid under those leases. We find that they must.

SandRidge makes two critical concessions in its brief. First, it concedes, as it must, that it paid firm transportation charges prior to producing and selling gas. "SandRidge's pipeline contracts were already in place before gas was produced." Second, it concedes that the "anticipated production" on which it based its decision to pay firm transportation charges was expected to come from the Green and Purple Leases "as well as other nearby leases." The fact that SandRidge incurred the firm transportation charges before gas was produced and sold does not, in and of itself, prohibit the expense from later being charged against royalties. But per the terms of the Green and Purple Leases, those charges may only be taxed against royalties on a *pro rata* basis:

> The royalties reserved by [Longfellow], and which shall be paid by [SandRidge], are . . . on gas . . . [sold by SandRidge] . . . one-eighth (l/8th) of the net proceeds *derived from the sale thereof* . . . remaining after deducting . . . all costs and expenses *actually incurred* by . . . [SandRidge in] . . . transporting . . . *the gas so sold* . . . . [Emphasis added].

Per these terms, any amounts that SandRidge deducts from royalties for earlier-paid firm transportation charges must directly correlate to the volumes of gas it produces, transports, and

sells under the Green and Purple Leases. Firm transportation charges that are incurred for pipeline space that is not ultimately used are not "actually incurred" in connection with the sale of gas produced from the Green and Purple Leases. Likewise, firm transportation charges that SandRidge incurred to reserve pipeline space for gas produced from "other nearby leases" are not taxable against royalties payable under the Green and Purple Leases. The trial court erred by failing to draw these critical distinctions. Accordingly, we sustain Longfellow's third issue.[16]

## IV. THE SOUTH PIÑON FEE LEASE

### A. SUMMARY OF THE PARTIES' DISPUTE REGARDING THE SOUTH PIÑON FEE LEASE

We next consider the South Piñon Fee Lease, which is between West and SandRidge only. West contends that this lease provides carbon dioxide royalties that are free of post-production costs.[17] This is the only lease at issue that expressly mentions carbon dioxide. The relevant royalty provisions of the South Piñon Fee Lease provide as follows:

### III. ROYALTIES

1. The royalties to be paid or delivered by Lessee to Lessor, its successors and assigns, are as follows:

a. <u>Oil Royalty</u>. . . .

b. <u>Gas Royalty</u>. On gas, casinghead gas, and other gaseous substances produced and saved from the Leased Premises, subject to clause c. below, the Royalty Percentage of the market value at the Royalty Valuation Point (hereafter defined).

---

[16] Our holding on this point leaves intact the trial court's partial denial of SandRidge's summary judgment motion based on its finding that a fact issue exists as to whether SandRidge reasonably incurred the firm transportation charges.

[17] SandRidge argues that West has limited our consideration to only paragraph III (1)(b) of the South Piñon Fee Lease. But unlike its similar argument regarding the Appellants' disavowal of certain State Lease paragraphs, SandRidge has not demonstrated that West affirmatively disavowed reliance on paragraph III (1)(c). SandRidge did not take the position in the trial court that West had limited itself to paragraph III (1)(b); nor did SandRidge so limit its own trial court arguments. To the contrary, SandRidge argued—as it does here—that paragraph *III(1)(c)* does not provide a separate carbon dioxide royalty. West responded to this argument—both here and below—by specifically citing and relying on paragraph III(1)(c) as providing a carbon dioxide royalty.

28

c. <u>Processed Gas</u>. On gas, casinghead gas, and other gaseous substances produced and saved from the Leased Premises and processed through or otherwise treated in any plant, whether by, or on behalf of, Lessee or any third party, the higher of (i) the Royalty Percentage of the market value of such gas at the inlet of the plant or (ii) the sum of (a) the Royalty Percentage of the market value at the tailgate of the plant of all liquid Hydrocarbons extracted or otherwise recovered from such gas, (b) the Royalty Percentage of the market value at the Royalty Valuation Point of all residue gas, which residue gas is understood to be the Hydrocarbon gas at the tailgate of the plant after the same has been processed or treated, and (c) the Royalty Percentage of the market value at the Royalty Valuation Point of all other substances extracted or otherwise recovered from such gas, *including carbon* dioxide and hydrogen sulfide, and any products extracted or recovered therefrom, including sulfur. [Emphasis added].

## B. THE SOUTH PIÑON FEE LEASE PROVIDES A ROYALTY ON CARBON DIOXIDE

Paragraph III(a)(3), the "processed gas" paragraph, expressly provides a royalty on carbon dioxide whenever the sum of the market value of extracted liquid hydrocarbons, extracted carbon dioxide, and residue methane is greater than the market value of raw gas at the inlet of a processing plant. SandRidge argues that this is not a separate royalty on carbon dioxide, but merely a formula for valuing a single royalty to be paid on the higher of two sums. Regardless of the number of royalties the paragraph provides, it provides West with compensation for the market value of carbon dioxide when the sum of the market value of carbon dioxide, NGLs, and residue gas exceeds the market value of residue gas at the inlet of the plant.[18] The declaration that West sought was not limited to whether or not a carbon dioxide royalty was due "separately," but at all. The trial court erred by denying West's request in its entirety. We sustain West's first issue as it pertains to the South Piñon Fee Lease.[19]

---

[18] The royalty is calculated by the market value of the carbon dioxide at the royalty valuation point, which is where the carbon dioxide is first sold or otherwise disposed of. We are not called upon to determine what the precise location of the royalty valuation point is, although the parties seem to generally agree that it is the point where title of the carbon dioxide passes to Oxy at the Century plant.

[19] To the extent that SandRidge disputes carbon dioxide royalties under the South Piñon Fee Lease on the basis that its arrangement with Oxy does not constitute a sale, we reject the argument. As previously noted, a "sale, in its broadest sense, includes any transfer of property from one person to another for a valuable consideration." *Walden v. Affiliated Computer Serv., Inc.*, 97 S.W.3d 303, 316 (Tex.App.—Houston [14th Dist.] 2003, pet. denied). It is

**C. THE SOUTH PIÑON FEE LEASE'S ROYALTIES ARE FREE OF POST-PRODUCTION COSTS**

Paragraph III(1)(e) of the South Piñon Fee Lease provides that West's royalties "shall not be reduced, directly or indirectly, on account of or charged with, any post-production cost, charge, expense or deduction, or any other cost of making the products produced hereunder ready or available for market." This no-deduct clause is not conditioned in any way; nor is there any market value at the well provision in the lease that renders it surplusage. Moreover, paragraph III(1)(e) expressly applies to carbon dioxide, as well as all other gases and substances extracted from the raw gas stream. SandRidge acknowledges these matters, but it contends that the clause prohibits the deduction of post-production expenses only *before* values are determined at the applicable royalty valuation point, but not after. West does not contest this: "Plaintiffs agree that if there were no value at the Royalty Valuation Points, so that value was added further downstream, then SandRidge could deduct costs in determining the values at the Royalty Valuation Points." It argues nonetheless that there was no summary judgment evidence establishing that such circumstances had indeed occurred, and thus that the trial court's declaration so conditioning the deduction of post-production expenses was improper. We agree. SandRidge did not adduce evidence establishing that the products presently or formerly had no value at the royalty valuation points. A trial court cannot render declarations regarding future, hypothetical situations. *Firemen's Ins. Co. of Newark, N.J. v. Burch*, 442 S.W.2d 331, 333 (Tex. 1969). We sustain West's second issue as it pertains to the South Piñon Fee Lease.

## V. THE 2005 LONGFELLOW LEASE

### A. SUMMARY OF THE PARTIES' DISPUTE REGARDING THE 2005 LONGFELLOW LEASE

---

unquestionable that Oxy's processing of the raw gas stream at no charge to SandRidge constitutes valuable consideration.

We next consider the 2005 Longfellow Lease, which is between Longfellow and SandRidge only. The parties dispute whether this lease provides carbon dioxide royalties and whether post-production costs can be charged against royalties. The relevant provisions of the 2005 Longfellow Lease are as follows:

3. Royalties. The royalties to be paid Lessor are:

(a) On oil . . .

(b) On all gas produced from the Land covered by the lease, including casinghead gas and residue gas sold at the tailgate of any plant through which gas produced from the land covered by the lease may be processed, the percentage set forth below of the gross proceeds received by Lessee from the sale of gas. . . . Lessors hereby reserve unto themselves [an option to take their share of royalty gas in kind] . . . .

(c) On condensate and other products separated extracted or manufactured from gas in any type of plant wholly owned by parties who are unaffiliated with Lessee, the percentage set forth below of all money and other consideration received by Lessee or to which Lessee is entitled under Lessee's contract or arrangement. . . .

(d) [This paragraph establishes royalty percentages that vary depending on when wells are drilled.]

(e) The royalties provided in this Paragraph 3 shall be determined and delivered to Lessor free of any development, production, compression, processing, transportation, delivery or like costs excepting, however, taxes applicable to Lessor's share of production which are paid by Lessee.

SandRidge contends that Longfellow has relied only on paragraph 3(b) as providing a royalty on carbon dioxide, and has repudiated any reliance on paragraph 3(c). We agree. Longfellow did not cite paragraph 3(c) in the trial court, even after SandRidge informed the trial court that it considered Longfellow's arguments to be limited to paragraph 3(b) only. Based on this undisputed understanding of Longfellow's arguments, SandRidge then limited its own arguments regarding carbon dioxide royalties to paragraph 3(b). Based on this procedural history, Longfellow has waived any reliance on paragraph 3(c). While we must consider and

31

examine the entirety of the 2005 Longfellow Lease in order to harmonize and effectuate all of its provisions, a carbon dioxide royalty that is payable under paragraph 3(c) cannot form the basis of a reversal of the trial court. *Thompson*, 94 S.W.3d at 554; TEX.R.CIV. P.166a(c).

## B. 2005 LONGFELLOW LEASE PARAGRAPH 3(b) DOES NOT PROVIDE A ROYALTY ON CARBON DIOXIDE

Paragraph 3(b) does not provide a royalty on carbon dioxide. Instead, it provides a royalty on "all gas produced from the Land covered by the lease, including casinghead gas and residue gas sold at the tailgate of any plant . . . ." Paragraph 3(c), in turn, provides a royalty on "condensate and *other products* separated extracted or manufactured from gas in any type of plant . . . ." [Emphasis added]. Carbon dioxide clearly constitutes an "other product" under paragraph 3(c). Nonetheless, this cannot be the basis of a reversal. *Thompson*, 94 S.W.3d at 554; TEX.R.CIV.P. 166a(c). We overrule Longfellow's first issue as it pertains to the 2005 Longfellow Lease.

## C. THE 2005 LONGFELLOW LEASE'S ROYALTIES ARE FREE OF POST-PRODUCTION COSTS

The clear, unambiguous language of paragraph 3(e) of the 2005 Longfellow Lease provides that all royalties provided under the lease are free of post-production costs. As it did regarding the South Piñon Fee Lease, SandRidge contends that the no-deduct clause prohibits the deduction of post-production expenses before values are determined at the applicable royalty valuation point, but not after. But once again, Sandridge did not adduce evidence establishing that any product on which a royalty is due under the lease is incurring a post-production expense after its royalty valuation point. As such, this argument was not a proper basis for granting SandRidge's declaration in opposition of the assessment of their post-production costs or transportation charges. *Burch*, 442 S.W.2d at 333. We sustain West's second issue as it pertains to the 2005 Longfellow Lease.

32

Based on all of the forgoing, we affirm the trial court's judgment in its entirety as to the State Leases and the Citation Lease. We also affirm the trial court's determination that carbon dioxide royalties are not owed under the Green and Purple Leases or the 2005 Longfellow Lease. We reverse the trial court's judgment regarding the South Piñon Fee Lease in its entirety and render judgment in favor of West. We also reverse the trial court's determination that all of the assessed firm transportation charges by Sandridge are deductible from royalties under the Longfellow Green and Purple Leases. We remand to the trial court for further proceedings regarding the determination of firm transportation charges under the Longfellow Green and Purple Leases in accordance with this opinion. We likewise reverse the trial court's determination that post-production fees are deductible from royalties under the 2005 Longfellow Lease.

November 19, 2014

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Barajas, C.J., (Senior Judge), and Chew, C.J. (Senior Judge)
Barajas, C.J. and Chew, C.J. (Senior Judges, sitting by assignment)

33