

# IN THE
# TENTH COURT OF APPEALS

### No. 10-07-00345-CV

**DAVID BLACKMON, REBECCA
BLACKMON REED, AND JAY HARLAN,**

                                                              **Appellants**

 **v.**

**XTO ENERGY, INC.,**

                                                              **Appellee**

**From the 82nd District Court
Robertson County, Texas
Trial Court No. 05-07-17,292-CV**

## O P I N I O N

        David Blackmon, Rebecca Blackmon Reed, and Jay Harlan (collectively the

"Blackmons") filed a declaratory judgment action against XTO Energy, Inc. alleging that

an oil and gas lease held by XTO had expired because the well was shut in. The

Blackmons also sought an accounting for allegedly unpaid royalties. The court granted

XTO's summary-judgment motion premised primarily on the grounds that: (1) the lease

did not terminate because the well remained capable of producing in paying quantities

while it was shut in; and (2) the Blackmons' predecessors-in-interest had previously

sold their royalty interests and so the Blackmons were not owed any royalty payments. The court denied the Blackmons' competing motion for partial summary judgment.

The Blackmons contend in six issues that the court erred by granting XTO's summary-judgment motion and denying their own because: (1) the well was not capable of producing in paying quantities; (2) XTO failed to properly pay the royalties owed them; (3) XTO failed to establish a limitations title to the mineral interests in question; (4) their conduct in executing a subsequent division order and accepting subsequent royalty payments did not revive or ratify the lease; (5) a four-year limitations statute applies because this is a suit on a debt; and (6) the court abused its discretion by failing to exclude certain summary-judgment evidence.

We will affirm.

## Background

The Blackmons' predecessors-in-interest, Hollis and Helga Blackmon and Barbara Thaemar, executed an oil, gas and mineral lease in favor of Wessely Energy Corporation in January 1983. This lease covered two adjoining tracts of land identified in the lease as: (1) a 33.5-acre tract in Section 8 of the Maria de la Concepcion Marquez Grant, A-25 (Tract 1); and (2) a 101.5-acre tract in the same Section 8 (Tract 2).[1] Wessely Energy pooled Tract 1 with other lands in the Biggs #1 Gas Unit in 1984. Production from the Biggs #1 Well in this unit held the lease beyond its primary term, but production ceased at this well in April 1997 because the third party (Texas Utilities Fuel Company) which had been purchasing the gas produced from this well refused to

---

[1] Subsequent surveys have revealed that Tract 2 actually contains 111.5 acres.

continue because the the carbon dioxide content was greater than three percent, which was contrary to the specifications of the purchase contract. No royalty payments were made to the Blackmons' predecessors-in-interest while the well was shut in. XTO's predecessor-in-interest installed an amine processing unit in September 1998 which removed the excess carbon dioxide from the gas, and production resumed.

## Production in Paying Quantities

The Blackmons contend in their first issue that they conclusively established the Biggs #1 Well was not capable of producing in paying quantities when it was shut in because XTO could not sell the gas flowing from the well without installing the amine processing unit to satisfy the carbon dioxide requirements of the TUFCO contract.[2]

According to settled law,

> the phrase "capable of production in paying quantities" means a well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

*Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 558 (Tex. 2002) (quoting *Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 433-34 (Tex. App.—Amarillo 1993, no writ)).

The Blackmons argue that the Biggs #1 Well was not capable of production in paying quantities "because it needed additional equipment or repairs in order to

---

[2]     Because the relevant facts are not in dispute, we dispense with any discussion of the applicable standard of review.

produce *marketable* gas." (emphasis added). We disagree. The focus is on whether the well is capable of producing gas in a marketable *quantity*, not a marketable *quality*.

In an opinion on rehearing in *Anadarko*, the Supreme Court did identify a marketing component that applies in certain cases when determining whether a well is capable of producing in paying quantities.

> [F]or a well to produce in paying quantities, or to be capable of producing in paying quantities, there must be facilities located near enough to the well that it would be economically feasible to establish a connection so that production could be marketed at a profit.

*Id.* at 559. The Court also quoted from a prior decision involving a marginal well and observed that the "paying quantities" part of the definition requires that income from the sale of the gas must exceed production and marketing costs. *Id.* (quoting *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 691 (1959)).

Here, the Biggs #1 Well was connected to pipeline facilities and was capable of producing a high volume of raw gas at the wellhead. *See id.* The reference to "additional equipment or repair[s]" in the *Anadarko* definition focuses on equipment or repairs necessary for raw gas to flow from the wellhead when the switch is turned "on" rather than on equipment installed downline to refine the raw product to marketable form. *Id.* at 558.

Cases addressing whether *post*-production costs should be included when calculating royalty payments are also relevant to this issue.

> Production costs are the expenses incurred in exploring for mineral substances and in bringing them to the surface. Absent an express term to the contrary, these costs are not chargeable to the non-operating royalty interest. Whatever costs are incurred *after* production of the gas or

> minerals are normally proportionately borne by both the operator and the royalty interest owners. These post-production costs include taxes, treatment costs to render the gas marketable, compression costs to make it deliverable into a purchaser's pipeline, and transportation costs.

*Cartwright v. Cologne Prod. Co.*, 182 S.W.3d 438, 444-45 (Tex. App.—Corpus Christi 2006, pet. denied) (citations omitted); *see Martin v. Glass*, 571 F. Supp. 1406, 1415 (N.D. Tex. 1983) ("Under the law of Texas, gas is 'produced' when it is severed from the land at the wellhead."), *aff'd*, 736 F.2d 1524 (5th Cir. 1984); *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996) ("Post-production marketing costs include transporting the gas to the market and processing the gas to make it marketable.").

> "Production" means "the act of producing oil, gas, and other minerals," not the act of transporting, gathering, treating, processing, or marketing oil or gas. Historically, "production" ceases once the lessee extracts oil or gas from the ground at the wellhead. The historical definition of "production" is consistent with the common understanding of the term; to "produce" is to make or create a product that did not previously exist, and not to refine or improve a product already in existence.

Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the "Product"?*, 37 ST. MARY'S L.J. 1, 88-89 (2005) (footnotes omitted); *accord* Bruce M. Kramer, *Interpreting the Royalty Obligation by Looking at the Express Language: What a Novel Idea?*, 35 TEX. TECH. L. REV. 223, 234 (2004) ("Production has been defined as 'actually taking oil or gas from the well in a captive state for either storing or marketing the product for sale.'") (quoting *Riley v. Meriwether*, 780 S.W.2d 919, 923 (Tex. App.—El Paso 1989, writ denied)).

Here, the amine processing unit was installed to render the gas of marketable quality. *See Heritage Resources*, 939 S.W.2d at 122; *Cartwright*, 182 S.W.3d at 444-45;

Keeling & Gillespie, *supra*, at 88-89. This is a *post*-production function. *Id.* And as petroleum geologist Anthony Fears explained in his summary-judgment affidavit, the amine processing unit "was added downstream of the wellhead."[3] Thus, it was not the type of "additional equipment" necessary to enable gas to flow from the wellhead in a producing quantity. *See Martin*, 571 F. Supp. at 1415; Keeling & Gillespie, *supra*, at 88; Kramer, *supra*, at 234; *cf. Anadarko Petroleum*, 94 S.W.3d at 558.

The summary-judgment evidence conclusively establishes that raw gas was capable of flowing from the wellhead of the Biggs #1 Well in a marketable quantity regardless of whether the amine processing unit was installed downstream. Therefore, the well was capable of producing in paying quantities when it was shut in.

We overrule the Blackmons' first issue.

### Failure to Pay Shut-In Royalties

The Blackmons contend in their second issue that the 1983 lease terminated ninety days after the Biggs #1 Well was shut in because XTO's predecessor-in-interest failed to pay shut-in royalties to all parties who were entitled to such payments under the lease.

The habendum clause[4] provides in pertinent part:

> If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all

---

[3]    The Blackmons do not challenge the admissibility of this statement in their sixth issue, though they do challenge other statements in Fears's affidavit.

[4]    "The habendum clause defines the duration of a gas lease." Nancy J. Forbis, Note, *The Shut-In Royalty Clause: Balancing the Interests of Lessors and Lessees*, 67 TEXAS L. REV. 1129, 1142 n.84 (1989); *see* OWEN L. ANDERSON ET AL., HEMINGWAY OIL AND GAS LAW AND TAXATION § 6.4, at 247 (4th ed. 2004).

such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. . . . If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph.

The Blackmons contend that these shut-in royalty provisions create a special limitation for which the lease is automatically terminated upon noncompliance. XTO argues that these provisions create a covenant which can be enforced only by a suit for monetary damages.

There are three primary qualifications generally imposed on the various ownership interests created by an oil and gas lease: (1) general and special limitations; (2) conditions subsequent; and (3) covenants. A.W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 8 TEXAS L. REV. 483, 483-84 (1930); *see Coastal Oil & Gas Corp. v. Roberts*, 28 S.W.3d 759, 763 (Tex. App.—Corpus Christi 2000, pet. granted, judgm't vacated w.r.m.).

The breach of a condition does not, of itself, divest the estate of the lessee, but to do this the lessor must, by express act, take advantage of the same by re-entry, or that which in law would be equivalent thereto.

A conditional limitation marks the period or event which is to determine the estate without entry or claim, and no affirmative act is necessary to vest the right in the grantor or him who has the next expectant interest.

In case of doubt as to the true construction of a clause in a lease, it should be held to be a covenant, and not a condition or limitation, as the law does not favor forfeitures.

*W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 31 (1929) (quoting *Johnson v. Gurley*, 52 Tex. 222, 227 (1879)) (citations omitted); *see Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989); *Coastal Oil & Gas Corp.*, 28 S.W.3d at 763; *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 506 (Tex. App.—Waco 1997, pet. denied).

As the Court held in *Johnson*,

A covenant is an agreement duly made between the parties to do or not to do a particular act.

For breach of [a] mere covenant the lessor has no right of reentry, unless, as is not the case here, there is an express clause in the agreement to this effect, but has the right to sue for damages only.

A condition is a qualification annexed to an estate by the grantor, whereby it may [be] created, enlarged, or defeated upon an uncertain event.

The lessor may, without an express clause to that effect, take advantage of a breach of condition by reentry or ejectment.

*Johnson*, 52 Tex. at 226-27 (citations omitted); *see Rogers*, 772 S.W.2d at 79; *Coastal Oil & Gas Corp.*, 28 S.W.3d at 763; *Hitzelberger*, 948 S.W.2d at 506.

The Blackmons cite *Freeman v. Magnolia Petroleum Co.*, 141 Tex. 274, 171 S.W.2d 339 (1943), and similar cases to support their contention that the shut-in royalty provisions created a special limitation. In *Freeman*, the lease at issue provided in pertinent part, "while said [shut-in] royalty is so paid, said well shall be held to be a producing well." *Id.* at 340. The Supreme Court held that this was a condition of the lease and, because the lessees failed to make a timely shut-in royalty payment, "[t]he

lease lapsed as a matter of law when they so failed." *Id.* at 342. However, the shut-in provisions of the Blackmons' lease are different.

Referring to royalty payments in general, it has been said that "[f]ew leases are found in which the nonpayment of royalty is a condition subsequent and rarer still is the lease in which it operates as a special limitation." Linton E. Barbee, *The Lessor's Remedies for Nonpayment of Royalty*, 45 TEXAS L. REV. 132, 159 (1966). "Non-payment of royalty will not typically terminate a lease, 'in the absence of a specific clause to that effect.'" *Coastal Oil & Gas Corp.*, 28 S.W.3d at 763 (quoting *Morriss v. First Nat'l Bank of Mission*, 249 S.W.2d 269, 279 (Tex. Civ. App.—San Antonio 1952, writ ref'd n.r.e)). "A lessor or an owner of a royalty interest cannot claim forfeiture or termination of an oil and gas lease for nonpayment of royalties in the absence of a specific provision of the lease to that effect." Barbee, *supra*, at 162 (quoting 3A W.L. SUMMERS, THE LAW OF OIL AND GAS § 614, at 512 (1958)).

But discussing shut-in royalties in particular, Barbee noted:

In "unless" leases,[5] failure to pay shut-in royalties, if they are provided for, after the expiration of the primary term operates indirectly as a special limitation if the well which has been capped is the only well on the tract. The shut-in royalty is a substitute for production; a cessation of shut-in royalty payments is a cessation of "production" under the habendum clause, and the lease terminates.

Barbee, *supra*, at 158 n.207 (citing *Freeman*, *supra*) (footnote added). Nevertheless, not every shut-in clause is conditioned on the payment of shut-in royalties.

---

[5] An "unless" lease is typically one with a provision that, if drilling is not commenced within a specified term, the lease will terminate "unless" delay rentals are paid. *See Humble Oil & Refining Co. v. Harrison*, 146 Tex. 216, 205 S.W.2d 355, 360 (1947); ANDERSON ET AL., *supra*, § 6.2, at 217; A.W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 8 TEXAS L. REV. 483, 520-21 (1930).

According to the Williams and Meyers treatise:

[M]any [shut-in] clauses provide that a lease shall be preserved even though there is no production or operations on the premises if a well capable of producing is shut-in; such clauses impose a duty to pay shut-in royalty. The normal remedy of the lessor where obligatory shut-in royalty is not paid is an action to recover the royalty rather than an action to cancel the lease.

3 HOWARD R. WILLIAMS ET AL., WILLIAMS & MEYERS OIL AND GAS LAW § 632.8, at 437

(2007).

The Anderson treatise has most directly addressed this issue.

The structure of the words of the shut-in royalty clause may also have an important effect upon the rights of a lessee who makes an improper shut-in payment. As *Freeman* illustrates, the usual effect of a lessee's failure to pay shut-in royalties properly is lease termination because most shut-in royalty clauses make failure to pay properly a special limitation or a condition to the term of the lease. On the other hand, if the language creates a mere promise to pay, then the lease should not terminate if payment is not made, but the lessor should be able to recover the payments. To put it another way, if the language makes proper payment the constructive production,[6] then if the payment is not made correctly the lease terminates because failure to have either actual or constructive production triggers the special limitation or condition to the term of the lease. But if the constructive production defined by the clause is the existence of a well on the premises capable of production in paying quantities, then the lease should not terminate at the end of the primary term even if the shut-in royalties are never paid.

OWEN L. ANDERSON ET AL., HEMINGWAY OIL AND GAS LAW AND TAXATION § 6.5, at 278

(4th ed. 2004) (footnote omitted) (footnote added).

---

[6] "Constructive production" is an action defined by the lease which operates as a substitute for actual production and keeps the lease in effect after the expiration of the primary term. It typically involves the payment of shut-in royalties when that payment is a special limitation on the lessee's interest or the existence on the premises of a well capable of producing in paying quantities. *See, e.g., Gulf Oil Corp. v. Reid*, 161 Tex. 51, 337 S.W.2d 267, 272 (1960); *Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 432 (Tex. App.—Amarillo 1993, no writ); ANDERSON ET AL., *supra*, § 6.5, at 273-74; *see also* Linton E. Barbee, *The Lessor's Remedies for Nonpayment of Royalty*, 45 TEXAS L. REV. 132, 158 n.207 (1966) (shut-in royalties are "a substitute for production").

Here, the constructive production defined by the habendum clause is the existence of a well on the premises capable of production in paying quantities. *See id.* The provision for payment of shut-in royalties is a covenant by the lessee which may be enforced by a suit for money damages. *Id.*; *see Rogers*, 772 S.W.2d at 79; *Johnson*, 52 Tex. at 226-27; *Coastal Oil & Gas Corp.*, 28 S.W.3d at 763; *Hitzelberger*, 948 S.W.2d at 506. Accordingly, the lease did not terminate because of any failure on the part of XTO's predecessor-in-interest to make shut-in royalty payments. *See* ANDERSON ET AL., *supra*, § 6.5, at 278.

We overrule the Blackmons' second issue.

## Conclusion

The 1983 lease did not terminate when the Biggs #1 Well was shut in because the well was capable of producing in paying quantities. The provision for payment of shut-in royalties is a covenant by the lessee which may be enforced by a suit for money damages. In view of these holdings, we need not address the remainder of the issues presented. *See* TEX. R. APP. P. 47.1. Accordingly, we affirm the judgment.

FELIPE REYNA
Justice

Before Chief Justice Gray,
      Justice Vance, and
      Justice Reyna
      (Chief Justice Gray concurring with note)*
Affirmed
Opinion delivered and filed December 10, 2008
[CV06]

\*        (Chief Justice Gray concurs.  A separate opinion will not issue.  He notes, however, that this lease has some unique provisions.  We must start our analysis of this lease with reference to and by analysis of those provisions.  Upon such an analysis, there is little need for references to general oil and gas treatises or earlier case law.  The parties to the lease left no doubt about production in paying quantities or that the payment of shut-in royalties was a covenant as opposed to a substitute for production.)