

# NUMBER 13-25-00131-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

DEVON ENERGY PRODUCTION
COMPANY, L.P., DEVON ENERGY
CORPORATION, BPX OPERATING
COMPANY, AND BPX PRODUCTION
COMPANY,                                                      Appellants,

v.

ROBERT LEON OLIVER, ET AL.,                                   Appellees.

---

## ON APPEAL FROM THE 135TH DISTRICT COURT
## OF DEWITT COUNTY, TEXAS

---

# MEMORANDUM OPINION[1]

**Before Chief Justice Tijerina and Justices Peña and West
Memorandum Opinion by Justice West**

---

This is an oil and gas lease royalty interpretation case. The trial court granted appellees' motion for summary judgment, finding that (1) appellees' royalty interest is not valued "at the well," (2) the correct formula for the royalty calculation is "one-fifth of market value . . . on the day of sale," and (3) appellants breached the parties' leases to the extent that they paid royalties based on any other formula. A jury trial commenced solely for the determination of damages, and the jury was instructed according to the trial court's summary judgment findings. The jury awarded damages, and a final judgment was entered awarding appellees a combined actual damage of $15,800,937.[2] Appellants argue the trial court erred in its construction of the lease in both the summary judgment findings and jury instructions.[3] Because we agree, we reverse and remand.

## I. BACKGROUND

Nine years after appellees' and appellants' predecessors-in-interest entered two oil and gas leases, appellees filed the underlying lawsuit alleging appellants breached the leases by underpaying royalties. Together, the leases involve 110 oil wells on over 3,700 acres of land in DeWitt County. The provisions of both are substantively identical. The first several paragraphs consist of form provisions, followed by several paragraphs in an attached addendum. The first paragraph of the addendum provides that where the provisions of the addendum conflict with the form provisions, the addendum provisions control and supersede. Paragraph three of the form provisions provides:

> As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipelines to which lessee may connect its wells, the equal

---

[2] The jury awarded appellees $9,915,188 against Devon and $6,857,896 against BPX. However, the final judgment reduced appellees' award against Devon to $8,943,041 after applying the parties' stipulation related to Devon's overpayment claim.

[3] Appellants also assert evidentiary issues we need not address since we reverse the judgment on other grounds. *See* TEX. R. APP. P. 47.1.

1/5th part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such 1/5th part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessors interest, in either case, to bear 1/5th of the cost of treating oil to render it marketable pipe line oil . . . .

Paragraph fifteen of the addendum provides:

Lessor's royalty on hydrocarbons shall never bear, either directly or indirectly, any portion of (A) the costs or expenses to save, store, gather, dehydrate, compress, pipe, truck, transport, treat, separate, process, refine, manufacture or market hydrocarbons on or from the leased premises, (B) the costs or expenses (including depreciation) to construct, repair, renovate or operate any plant or other facilities or equipment used in connection with the treating, separation, extraction, processing, refining, manufacture or marketing of hydrocarbons produced from the leased premises or lands pooled therewith, (C) any other costs or expenses whatsoever, except, Lessor's royalty shall bear its proportionate part of all ad valorem, excise, state severance taxes, windfall profits taxes, or like and similar tax imposed on such hydrocarbons or on the value thereof that is attributable to Lessor's royalty, if any, paid by Lessee, which proportionate part may be deducted from Lessor's royalty interest before payment to Lessor.

Paragraph thirty-five of the addendum provides:

All royalties to be paid pursuant to the terms of this lease are to be twenty percent (20%) and wherever the fractions one-eighth (1/8th) or one-tenth (1/10th) appear in the printed form portion of this lease or $1.00 appears in paragraph 3 of the printed form portion of this lease, twenty percent (20%) shall be substituted therefor. Lessor shall be paid royalty on all oil or gas produced, including oil or gas used by Lessee for operations on or off the leased premises.

Paragraph thirty-eight of the addendum provides:

Lessor reserves the right to take, receive and market Lessor's royalty share of all oil, in kind, to be delivered by Lessee to Lessor at the wells into facilities provided by Lessee, or at the direction of Lessor, into pipelines connected therewith, free and clear of all costs and expense. Lessor may exercise Lessor's right to take and market in kind by giving thirty (30) days written notice to Lessee. Pending such notice, Lessee shall purchase or market Lessor's oil at a cash price equal to the market value on the day of sale.

3

Appellees asserted in the trial court and on appeal that paragraph three of the form provisions is contradictory to the addendum provisions and thus is entirely superseded by the addendum provisions. On the other hand, appellants asserted that paragraph three is not superseded related to defining the point of value as "at the wells as of the day it is run to the pipe[]line or storage tanks."

The trial court granted summary judgment in favor of appellees as provided above. And at trial, the jury was charged as follows:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [appellees] for their damages, if any, that resulted from [appellants'] failure to pay royalties on oil according to the Leases?
>
> You are instructed that the Leases require Lessees to purchase or market Lessors' oil at a cash price equal to the market value on the day of sale.
>
> You are further instructed that Lessors' royalty on hydrocarbons shall never bear either, directly or indirectly, any portion of (A) the costs or expenses to save, store, gather, dehydrate, compress, pipe, truck, transport, treat, separate, process, refine, manufacture or market hydrocarbons on or from the leased premises, (B) the cost or expenses (including depreciation) to construct, repair, renovate or operate any plant or facilities or equipment used in connection with the treating, separation, extraction, processing, refining, manufacture or marketing of hydrocarbons produced from the leased premises or lands pooled therewith, (C) any other costs or expenses whatsoever.
>
> "Market value" is the price a willing seller not obligated to sell can obtain from a willing buyer not obligated to buy. You are instructed, however, that in determining market value, [appellees'] oil royalty is not valued 'at the well.'
>
> Market value may be determined by comparable sales in the relevant market. A 'comparable sale' is one that is comparable in time, quality, quantity, and availability of marketing outlets.
>
> Consider only the difference, if any, between the market value of the [appellees'] royalty share of oil produced from the subject Leases and the

4

amount of royalty [appellees] were actually paid on oil produced from those Leases from April 20, 2012[,] to December 31, 2021.

Do not include interest on any amount of damages you find.

Answer in dollars and cents, if any, for each of the following:

Devon: _____

BPX: _____

The jury awarded appellees damages, and the trial court entered the final judgment discussed above. This appeal followed.

## II.     STANDARD OF REVIEW

Interpretation of a mineral lease involves questions of law that we review de novo. *Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023). Moreover, both grant of summary judgment and whether a jury charge misstates the law is reviewed de novo. *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021); *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002); *City of Austin v. Membreno Lopez ex. rel. Lopez*, 632 S.W.3d 200, 227 n.21 (Tex. App.—Austin 2021, pet. denied). In de novo review, we exercise our own discretion and accord no deference to the trial court's decision. *Vaughn v. Vaughan*, 710 S.W.3d 412, 418 (Tex. App.—Eastland 2025, pet. denied) (citing *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998)). We reverse judgments for charge error when the error was "harmful because it probably caused the rendition of an improper verdict." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009); Tex. R. App. P. 44.1(a)(1).

5

Allocation of post-production costs related to royalty payments is a "frequently litigated issue." *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021). For contextual purposes, resolution of these issues merits an overview of the "nuances in arcane oil and gas terminology." *See id.* at 388. To start, "production" refers to the process of bringing minerals to the surface; such concludes at the wellhead. *Id.* at 387; *Blackmon v. XTO Energy*, 276 S.W.3d 600, 604 (Tex. App.—Waco 2008, no pet.) (citation omitted) ("[P]roduction ceases once the lessee[-producer] extracts oil or gas from the ground at the wellhead."). A royalty payment is a lessor's[4] fractional share of production under a lease, and it "may be calculated at the wellhead or at any downstream point, depending on the lease terms." *Randle*, 620 S.W.3d at 387. As a default matter, royalties are free of production costs (expenses related to extraction from the land) but not post-production costs (expenses related to preparation of minerals for downstream sale). *Id.* These default rules are freely modifiable by parties to a mineral lease. *Id.*

A royalty clause has three components: (1) a royalty fraction, (2) a yardstick, and (3) a valuation point. *Id.* The royalty fraction denotes the mathematical share owed to the lessor, e.g., 1/5th, 20%. *See id.* The yardstick represents the pricing mechanism for the royalty, e.g., market value, proceeds, amount realized, price.[5] *See id.* And the valuation

---

[4] For clarity purposes, the "lessor" is the mineral interest owner who leases their interest to a lessee-producer under an oil and gas lease.

[5] "Market value" is based on comparable sales, meaning sales that are "comparable in time, quality, quantity, and availability of marketing outlets." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996). If there are no comparable sales at the valuation point specified in the lease, then courts employ a workback method wherein the comparable sale price at a downstream sale point is identified; then, the post-production costs (incurred between the valuation point and the downstream sale price) are subtracted to render the lease royalty. *Id.* In contrast, a yardstick based on "proceeds" is based on the monies actually received by the producer at the specified valuation point. *BlueStone Nat. Res. II, LLC v.*

point is the location at which the yardstick is applied, e.g., at the well, at the point of sale. *See id.* The valuation point is important because the price of oil increases as it moves from the wellhead toward downstream markets where oil is regularly sold. *See id.* at 388–89; *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 4 n.8 (Tex. 2014). This is because no post-production costs (e.g. transportation and treatment costs) are incurred at the well but are incurred downstream. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 123, 131 (Tex. 1996); *see also City of Crowley v. TotalEnergies E&P USA, Inc.*, No. 02-24-00088-CV, 2025 WL 2005511, at *8 (Tex. App.—Fort Worth July 17, 2025, pet. filed) (mem. op.); *Shirlaine W. Properties Ltd. v. Jamestown Res., L.L.C.*, No. 02-18-00424-CV, 2021 WL 5367849, at *5–7 (Tex. App.—Fort Worth Nov. 18, 2021, pet. denied) (mem. op.).

A lease may also include a post-production cost clause providing that the royalty will or will not bear post-production costs. *See Heritage*, 939 S.W.2d at 123; *Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 871, 873 (Tex. 2016); *Sheppard*, 668 S.W.3d at 337; *see also City of Crowley*, 2025 WL 2005511, at *3, *8; *Shirlaine*, 2021 WL 5367849, at *5, *7. When the lease specifies a valuation point, a generic post-production cost clause is construed as applying to post-production costs incurred by the producer up to the valuation point. *See, e.g.*, *Heritage*, 939 S.W.2d at 123, 131; *Hyder*, 483 S.W.3d at 871, 873; *Sheppard*, 668 S.W.3d at 344; *see also City of Crowley*, 2025 WL 2005511 at *3, *8 (finding that where the valuation point was effectively fixed at the well, the producer did not realize proceeds after deducting post-production expenses); *Shirlaine*, 2021 WL

---

*Randle*, 620 S.W.3d 380, 389 (Tex. 2021).

5367849 at *5, *7 (finding that where the valuation point was effectively fixed at the well, the post-production clause could not move the valuation point such that the lease converted into a total proceeds lease). For example, if the valuation point is at a *point of sale* downstream from the well and a clause frees the royalty of post-production costs, then the royalty payment shall be based on the yardstick at the point of sale (without any deduction related to post-production costs incurred by the producer pre-sale).[6] *See, e.g.*, *Sheppard*, 668 S.W.3d at 344, 348. If, on the other hand, the valuation point is *at the well* and a clause frees the royalty of post-production costs, such clause is superfluous because no post-production costs are incurred by the producer at the well. *See, e.g.*, *Heritage*, 939 S.W.2d at 123, 131; *see also City of Crowley*, 2025 WL 2005511 at *3, *8; *Shirlaine*, 2021 WL 5367849 at *5, *7.

In *Heritage*, the Texas Supreme Court found that where the royalty valuation point was "at the well," a post-production cost clause[7] did not require that the royalty bear post-production costs that would be incurred downstream from the valuation point. *Heritage*, 939 S.W.2d at 123, 131. The Court reasoned:

> We recognize that our construction of the royalty clauses in [the] leases arguably renders the post-productions clause unnecessary where gas sales occur off the lease. However, the commonly accepted meaning of the "royalty" and "market value at the well" terms renders the post-production clause in each lease surplusage as a matter of law.

---

[6] Notably, there could also be additional post-production costs incurred by downstream purchasers post-sale from the producer. However, a generic post-production cost clause does not free the royalty from those distant post-sale costs. *See Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 344 (Tex. 2023) (providing that where the valuation point was the point of sale, "[t]he question is not whether an unaffiliated buyer's postproduction costs are gross proceeds under . . . the law. Of course, they are not[;] . . . . The landowners cite no precedent requiring producers to pay royalty on postproduction costs incurred downstream from the point of sale.").

[7] The post-production cost clause in *Heritage* provided as follows: "there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas." 939 S.W.2d at 123.

*Id.* at 123. Justice Owen's concurring opinion, which became the plurality opinion,[8] provided that the lease was not ambiguous but that the post-production cost clause was merely surplusage when considering that, at the well, no post-production costs are incurred.[9] *Id.* at 131. Justice Owens further provided two examples for how parties may ensure the producer bears all post-production costs: (1) changing the valuation point, or (2) drafting a clause specifying a payment "in addition to" the payment model based on the valuation point. *Id.*

In *Sheppard*, the Texas Supreme Court construed a lease that provided for a royalty based on "the gross proceeds realized from the sale of such gas, free of all costs and expenses." 668 S.W.3d at 337. The lease contained an additional clause providing that "any reduction or charge" related to post-production expenses "shall be *added to* . . . gross proceeds so that Lessor's royalty shall never be chargeable directly or indirectly with any costs or expenses other than its pro rata share of severance or production taxes." *Id.* at 337–38 (emphasis omitted). In yet another clause, the lease reiterated once more that lessor shall never bear or be charged with any post-production cost directly or indirectly (specifically citing several examples) and provided that such language shall not be treated as "surplusage" as discussed in *Heritage*. *Id.* at 338. The *Sheppard* Court

---

[8] Former Chief Justice Hecht explains the *Heritage* plurality in *Chesapeake Expl., L.L.C. v. Hyder*. *See* 483 S.W.3d 870, 875 n.25 (Tex. 2016).

[9] The Court has found post-production cost lease language to be surplusage in other cases too. In *Hyder*, the Court found that royalty clause language requiring payment based on the *price actually received* by the producer at a gathering system *point of sale* ensured that the royalty was free of post-production costs incurred by the producer up to the point of sale. 483 S.W.3d at 871, 873. The price *actually received* at the *point of sale* necessarily precluded any deductions for pre-sale, post-production costs incurred. *See id.* at 873. Thus, subsequent lease language related to the free and clear nature of the royalty "has no effect on the meaning of the provision [but] might be regarded as emphasizing the cost-free nature of the gas royalty, or as surplusage." *Id.*

9

explained that leases based on "gross amounts received" (e.g., gross proceeds) mean that royalties are paid based on the amount paid to the producer at the point of sale without (1) deducting post-production costs incurred by the producer pre-sale (such as processing and transportation costs) or (2) crediting post-production costs that will be incurred by downstream purchasers. *Id.* at 344. The Court then found that the *Sheppard* lease terms did two distinct things: (1) required royalties based on gross proceeds (as just discussed) and (2) required an "*addition* to [the] gross proceeds" payment. *Id.* at 346. The Court noted that one of the two tools *Heritage* expressly provided that mineral lease parties could employ to ensure post-production costs were borne by the producer is the inclusion of a clause specifying a payment in "add[ition] to" the payment model based on the valuation point. *Id.* at 347. The Court moreover acknowledged that the *Sheppard* lease expressly provided that its language regarding post-production costs shall not be construed as surplusage under *Heritage*. *Id.* For the foregoing reasons, the Court ruled that the lease required the producer to (1) bear the post-production costs incurred up to the valuation point (the point of sale) and (2) "add[] to [such] gross proceeds" payment the post-production costs incurred by post-sale purchasers downstream from the producer's point of sale. *Id.* at 348.

## IV. DISCUSSION

Here, appellants argue paragraph three provides a valuation point: "at the wells as of the day it is run to the pipe[]line or storage tanks." Appellees concede that the addendum clauses do not expressly provide a different valuation point. In fact, appellees argued that the actual valuation point was a fact issue for the jury to determine. At trial, they argued before the jury that such point was the Magellan East Houston Terminal at

the Houston Ship Channel. Appellees rationalize their position by asserting that the addendum clauses imply that the royalty should be paid at the downstream point where all post-production costs have been incurred.

First, we agree with appellees that the addendum clauses do not expressly provide for a valuation point. We additionally find that the addendum does not make paragraph three's valuation point "at the wells" ambiguous. We address each paragraph of the addendum in reverse order. Paragraph thirty-eight merely provides that, pending notice from appellees electing an in-kind distribution, appellants "shall purchase or market [appellee's] oil at a cash price equal to the market value on the day of sale."[10] Paragraph thirty-five merely provides that certain "1/8," "1/10," and "$1.00" royalty references in the form provisions should be replaced with twenty percent, and appellees should be paid a royalty on all minerals produced—including those used by appellants for operations. Paragraph fifteen merely provides that the royalty shall not bear various listed post-production costs. Paragraph fifteen thus supersedes and replaces the post-production cost language in paragraph three which follows the valuation point language. Thus, paragraph three reads as follows when paragraph fifteen is applied:

> As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipelines to which lessee may connect its wells, the equal 1/5th part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such 1/5th part of such oil at the wells as of the day it is run to the pipe line or storage tanks, ~~lessors interest, in either case, to bear 1/5th of the cost of treating oil to render it marketable pipe line oil~~[.] *Lessor's royalty*

---

[10] To the extent appellees argue that, by specifying "market value" but not specifying "at the wells," paragraph thirty-eight conflicts with paragraph-three, we disagree. Paragraph thirty-eight addresses the yardstick ("market value"), but it does not address the valuation point ("at the wells"). Paragraph thirty-eight's silence on the valuation point does not render it in conflict with the "at the wells" valuation point specified in paragraph three. Similarly, paragraph thirty-eight does not address the royalty fraction, but appellees do not argue that paragraph thirty eight's silence on the royalty fraction creates ambiguity or renders it in conflict with other lease provisions specifying such ("1/5").

11

*on hydrocarbons shall never bear, either directly or indirectly, any portion of (A) the costs or expenses to save, store, gather, dehydrate, compress, pipe, truck, transport, treat, separate, process, refine, manufacture or market hydrocarbons on or from the leased premises, (B) the costs or expenses (including depreciation) to construct, repair, renovate or operate any plant or other facilities or equipment used in connection with the treating, separation, extraction, processing, refining, manufacture or marketing of hydrocarbons produced from the leased premises or lands pooled therewith, (C) any other costs or expenses whatsoever, except, Lessor's royalty shall bear its proportionate part of all ad valorem, excise, state severance taxes, windfall profits taxes, or like and similar tax imposed on such hydrocarbons or on the value thereof that is attributable to Lessor's royalty, if any, paid by Lessee, which proportionate part may be deducted from Lessor's royalty interest before payment to Lessor.*[11]

Here, similar to *Heritage*, the post-production language does not make the lease ambiguous or otherwise conflict with the valuation point language. *See* 939 S.W.2d at 123, 131. The lease establishes the royalty fraction, yardstick, and valuation point: "the *average posted market price* of such *1/5th* part of such oil *at the wells as of the day it is run to the pipe line or storage tanks*." (emphasis added). The latter part from paragraph fifteen applies at the established valuation point and thus could be read as follows: "Lessor's [1/5th part of such oil at the wells as of the day it is run to the pipe[]line or storage tanks] shall never bear, either directly or indirectly [the listed post-production costs]." In other words, "at the wells," no post-production costs shall be borne. Such is mere surplusage, meaning the parties did not need to include the post-production language because there are no post-production costs borne "at the well" over which the language could govern.[12] *See Heritage*, 939 S.W.2d at 123, 131; *Hyder*, 483 S.W.3d at 873; *see*

---

[11] The paragraph three language replaced is struck through. The replacement language from paragraph fifteen is emphasized.

[12] Acknowledging that "we strive to harmonize and give effect to all the lease provisions so that none will be rendered meaningless," *Sheppard*, 668 S.W.3d at 343, we note that the parties may not have intended the post-production cost language to be redundant. It could be that the parties negotiated with a careful eye toward changes in industry custom and technological advancement. The parties may have

12

*also City of Crowley*, 2025 WL 2005511, at *3, *8 (rejecting appellant's argument that where the valuation point was effectively at the wellhead, the royalty must be calculated based on a downstream price because the lease's post-production provision provided that "Lessor's royalty will never bear, either directly or indirectly, any part of the costs or expenses of [post-production]"); *Shirlaine*, 2021 WL 5367849, at *5 (finding that where a royalty clause provided a valuation point effectively at the wellhead, the post-production cost language was mere surplusage). Moreover, unlike in *Sheppard*, the lease at issue does not specify another payment model to be remitted *in addition to* the royalty payment specified "at the well;" it also does not draft around *Heritage*. *See Sheppard*, 668 S.W.3d at 347–48.

Thus, the royalty at issue is calculated "at the wells as of the day it is run to the pipe[]line or storage tanks." The trial court's summary judgment findings and jury charge improperly construed the leases. Because the trial court's charge allowed the jury to assess damages based on the price at the Houston Ship Channel—a valuation point where the crude oil has incurred all post-production costs and is the most valuable according to the parties—we find the error was harmful in that it probably caused the rendition of an improper judgment. *See Hawley*, 284 S.W.3d at 856; Tex. R. App. P. 44.1(a)(1). The proper remedy is reversal. *See Hawley*, 284 S.W.3d at 856; Tex. R. App. P. 44.1(a)(1).

---

intended to ensure that if future technology allows for the performance of activities—that are currently understood to be post-production activities—before the crude oil reaches the surface, then such activities would not burden appellees' royalty.

## V.  CONCLUSION

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

JON WEST
Justice

Delivered and filed on the
26th day of February, 2026.